# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

### *Southern Division*

| | |
|---|---|
| IN RE US FERTILITY, LLC DATA SECURITY LITIGATION<br><br>This Document Relates To:<br><br>*All Actions* | **Master File No. 8:21-cv-299**<br><br>**First Amended Consolidated Class Action Complaint** |

### FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Alec Vinsant, Marla Vinsant, Jane Doe 1, Lisa Cox, Nikitia Hollingsworth Forest, Doris Matthew, Jane Doe, Paul Porta, Kelly Jacobs, Heidi Schneider, Laura Petersen, Riley Fadness, Tiffany Hitaffer, Karen Logan, Raynard Stuckey, Samantha Stuckey, Britt Decker, Anne Strickland, and Cristielly Santana, and Patrisia Vela (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to them and based on the investigation of their counsel, hereby bring this First Amended Consolidated Class Action Complaint against Defendants US Fertility, LLC ("USF"), Shady Grove Reproductive Science Center P.C. ("Shady Grove"), and Fertility Centers of Illinois, S.C.bam ("Fertility Centers").[1]

---

[1] Shady Grove and Fertility Centers will be referred to collectively as the "Clinic Defendants" except where necessary to distinguish them.

## INTRODUCTION AND NATURE OF THE CASE

1.      In a recent Executive Order, President Joe Biden reaffirmed that "[t]he United States faces persistent and increasingly sophisticated malicious cyber campaigns that threaten the public sector, the private sector, and ultimately the American people's security and privacy." Exec. Order No. 14028, 86 Fed. Reg. 26633 (May 12, 2021). Among other things, the Order noted that "[t]he private sector must adapt to the continuously changing threat environment, ensure its products are built and operate securely, and partner with the Federal Government to foster a more secure cyberspace. In the end, the trust we place in our digital infrastructure should be proportional to how trustworthy and transparent that infrastructure is, and to the consequences we will incur if that trust is misplaced." *Id.*

2.      Here, unfortunately, USF and the Clinic Defendants violated that trust, leaving Plaintiffs and the putative Class to incur the consequences. In November 2020, USF announced that it allowed hackers to covertly obtain intimate medical information and sensitive financial information on nearly 900,000 individuals whose information USF obtained from the Clinic Defendants. In pursuit of private medical treatments, Plaintiffs and the Class members entrusted Defendants to protect their highly sensitive personal identifying information ("PII") and personal health information ("PHI") (collectively

referred to as "PII" unless there is a need to distinguish the two). Apparently that trust was misplaced.

3.      Plaintiffs bring this class action against USF on behalf of themselves and all other persons harmed by the USF Data Breach. In addition, certain Plaintiffs, identified below, bring state-specific class action claims against the Clinic Defendants for failing to protect their PII and negligently entrusting it to USF.

4.      USF is one of the largest back-office support services networks for fertility clinics in the United States, providing administrative, clinical, and business information services. Its entire business model revolves around collecting and processing personal, medical, clinical, and financial information related to fertility treatments.

5.      While USF is happy to monetize Plaintiffs' PII, it ignored its ethical and legal responsibilities to keep their data secure. From at least August 12 to September 14, 2020, hackers were able to infiltrate USF's computer networks, locate sensitive PII, and download that data without USF ever noticing. The hackers obtained a vast trove of PII, including patients' names, dates of birth, addresses, Social Security numbers, driver's license and state ID numbers, passport numbers, health insurance and claims information, credit and debit card information, financial account information, and medical records.

6.    Instead of immediately notifying patients that their PII had been exfiltrated, USF waited over two months to make a public statement. It was not until around November 2020 that USF began notifying patients of the fertility clinics using its services that its systems had been breached.

7.    Fertility-related issues and treatments, whether one is a donor or a recipient, are particularly sensitive and private matters, and those going through them have reasonable expectations that their private information, including their PHI and PII, will be protected and remain confidential. Accordingly, USF Data Breach victims are vulnerable to (and need to protect themselves from) an extraordinarily broad and severe set of set of criminal attacks.

8.    USF's carelessness and inadequate data security caused patients of fertility clinics utilizing USF's services to lose all sense of privacy. Plaintiffs and Class members have suffered irreparable harm, including the exposure of their private medical history to nefarious strangers and their significantly increased risk of identity theft. The type of sensitive information taken here is the very kind of information that allows identity thieves to construct false identities and invade all aspects of Plaintiffs' and the Class members' lives. In addition to facing the emotional devastation of having such personal information fall into the wrong hands, Plaintiffs and the Class members also must now undertake additional security measures and precautions to minimize their risk of identity theft.

9.     Plaintiffs' and the Class members' rights were disregarded by Defendants' negligent or reckless failure to take adequate and reasonable measures to ensure its data systems were secure and the PII entrusted to it would not be stolen. Defendants also failed to disclose the material fact that it did not have adequate information security controls to safeguard PII, failed to take foreseeable steps to prevent the Data Breach, and failed to monitor and timely detect the Data Breach.

10.     Likewise, the Clinic Defendants violated their patients' trust by failing to limit the PII they shared with business associates and vendors such as USF and failing to ensure that such business associates or vendors implemented and maintained adequate security measures to protect the highly sensitive PII of the patients of the Clinic Defendants.

11.     As a result of the Data Breach, Plaintiffs' and Class members' PII has been and will continue to be exposed to criminals for misuse. The injuries Plaintiffs and the Class members have suffered or may suffer as a direct result of the Data Breach include:

a.    Theft of highly sensitive medical, personal, and financial information;

b.    Financial fraud, including false account openings, financial account takeover, tax refund fraud, and unauthorized charges on debit and credit card accounts;

c.   Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

d.   Damages arising from the inability to use financial accounts and payment cards that are suspended or otherwise rendered unusable because of fraudulent charges stemming from the Data Breach;

e.   Damages arising from the inability to withdraw or otherwise access funds because accounts were suspended, restricted, or otherwise rendered unusable as a result of the Data Breach, including missed bill and loan payments, late-payment charges, and lowered credit scores and other adverse impacts on credit;

f.   Costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach, which can take dozens of hours per person, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach;

g.   Extortion and threats of extortion based on sensitive and private reproductive medical treatment histories leaked onto the dark web;

h. The imminent and impending injury resulting from the potential fraud and identity theft posed by PII being exposed for theft and sale on the dark web; and

i. The loss of their privacy, including the exposure of sensitive health and reproductive data.

12. The sensitive PII stolen in this Data Breach remains in USF's and the Clinic Defendants' possession. As such, Plaintiffs and the Class not only seek damages for the injuries they have suffered or that are imminent, but also seek injunctive relief commanding USF and the Clinic Defendants to upgrade their data security to contemporary standards commensurate with the very private and sensitive nature of the PII.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the Class, defined below, is a citizen of a different state than Defendant, and there are more than 100 putative Class members.

14. This Court has personal jurisdiction over Defendants USF and Shady Grove Fertility because they maintain their principal place of business in

this District, are registered to conduct business in Maryland, and have sufficient minimum contacts with Maryland.

15.     This Court has personal jurisdiction over the over Clinic Defendants because they entered into contracts with USF and exposed Plaintiffs and Class Members to the harms they now face by transmitting their PII to USF in this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

17.     Plaintiff Alec Vinsant is a citizen of the State of Texas and resides in Sulphur Springs, Texas.

18.     Plaintiff Marla Vinsant is a citizen of the State of Texas and resides in Sulphur Springs, Texas.

19.     Plaintiff Jane Doe 1 is a citizen of the State of Maryland and resides in Brandywine, Maryland.

20.     Plaintiff Lisa Cox is a citizen of the State of California and resides in El Cajon, California.

21.     Plaintiff Nikitia Hollingsworth Forest is a citizen of the State of Maryland and resides in Accokeek, Maryland.

22.     Plaintiff Doris Matthew is a citizen of the State of Virginia and resides in Woodbridge, Virginia.

23.     Plaintiff Jane Doe 2 is a citizen of the State of Florida and resides in Riverview, Florida.

24.     Plaintiff Paul Porta is a citizen of the State of Florida and resides in Debary, Florida.

25.     Plaintiff Kelly Jacobs is a citizen of the State of South Carolina and resides in Mullins, South Carolina.

26.     Plaintiff Heidi Schneider is a citizen of the State of California and resides in Long Beach, California.

27.     Plaintiff Laura Petersen is a citizen of the State of California and resides in Ferndale, California.

28.     Plaintiff Riley Fadness is a citizen of the State of Idaho and resides in Ammon, Idaho.

29.     Plaintiff Tiffany Hitaffer is a citizen of the State of Virginia and resides in Richmond, Virginia.

30.     Plaintiff Karen Logan is a citizen of the State of Kansas and resides in Overland Park, Kansas.

31.     Plaintiff Raynard Stuckey is a citizen of the State of South Carolina and resides in Georgetown, South Carolina.

32.    Plaintiff Samantha Stuckey is a citizen of the State of South Carolina and resides in Georgetown, South Carolina.

33.    Plaintiff Britt Decker is a citizen of the State of Illinois and resides in Chicago, Illinois.

34.    Plaintiff Anne Strickland is a citizen of the State of North Carolina and resides in Garner, North Carolina.

35.    Plaintiff Cristielly Santana is a citizen of the State of Florida and resides in Apopka, Florida.

35.36. Plaintiff Patrisia Vela is a citizen of the State of California and resides in Norwalk, California.

36.37. Defendant US Fertility, LLC ("USF") is incorporated in the State of Delaware and maintains its principal place of business at 9600 Blackwell Road, Suite 500, Rockville, Maryland. USF provides administrative, clinical, and business information solutions to fertility clinics across the United States.

37.38. USF is a joint venture that was formed in May 2020 between Shady Grove Fertility, a corporation that operates fertility clinics in eight states, and Amulet Capital Partners, a private equity firm that invests primarily in the healthcare industry. USF has over 55 locations across ten states.

38.39. With its creation, USF became "the largest physician-owned and physician-led organization supporting leading fertility programs across the United States and internationally…"[2]

39.40. USF provides IT platforms and services to many fertility clinics, including Georgia Reproductive Specialists, LLC d/b/a SGF Atlanta, Center for Reproductive Endocrinology, Center for Reproductive Medicine & Advanced Reproductive Technologies, Center for Reproductive Medicine Alabama, Center for Reproductive Medicine Orlando, Coastal Fertility Specialists, Fertility Centers of Illinois, LLC, Fertility Partners of Pennsylvania Surgery Center, LLC, Idaho Center for Reproductive Medicine, Nevada Center for Reproductive Medicine, Nevada Fertility Center, New York Fertility Medical Practice, PLLC d/b/a SGF New York, Northwest Center for Infertility and Reproductive Endocrinology, LLP d/b/a IVF Florida Reproductive Associates, Reproductive Endocrinology Associates of Charlotte, Reproductive Partners Fertility Center - San Diego, Reproductive Partners Medical Group, Inc., Reproductive Science Center of the San Francisco Bay Area, Seattle Reproductive Medicine, SGF Tampa Bay, LLC, Shady Grove Fertility Center of Pennsylvania, PLLC, Shady Grove Reproductive

---

[2] *US Fertility Becomes the Largest Physician-Owned, Physician-Led Network of Fertility Practices in the Nation*, Businesswire (Sept. 22, 2020), https://www.businesswire.com/news/home/20200922005342/en/US-Fertility-Becomes-the-Largest-Physician-Owned-Physician-Led-Network-of-Fertility-Practices-in-the-Nation.

Science Center, P.C., Sher Institute of Reproductive Medicine New York, Sher Institute of Reproductive Medicine St. Louis, UNC Fertility, Utah Fertility Center, Virginia Fertility Associates, LLC d/b/a SGF Richmond, Virginia IVF and Andrology Center, LLC, Arizona Reproductive Medicine Associates, Fertility Centers of Orange County, NYU Langone Reproductive Specialists of New York, Midwest Fertility Specialists, and Boston IVF.

40.41. Defendant Shady Grove Reproductive Science Center P.C. is a Maryland professional corporation that is registered as a foreign corporation with the Corporations Division of the D.C. Department of Consumer and Regulatory Affairs.

41.42. Defendant Fertility Centers of Illinois, S.C.bam is an Illinois corporation with its principal place of business in Chicago, Illinois.

## FACTUAL BACKGROUND

42.43. Information security and privacy are some of the most important concerns for USF's and the Clinic Defendants' customer base, and they market themselves accordingly. Unfortunately, they failed to implement the controls that they promised.

~~43.~~44. For example, USF markets itself on its website as providing "Secure Data Management" with a "secure suite" of professional management services for fertility clinics.[3]

~~44.~~45. The Clinic Defendants are fertility clinics and affiliates or partners of USF and use USF to provide the services listed above.



~~45.~~46. In providing their services, the Clinic Defendants create, collect, and store their patients' PII, including personal, financial, and medical information.

---

[3] *Driving Practice Success*, https://www.usfertility.com/physicians/practice-success/ (last visited January 21, 2021).

46.47. The Clinic Defendants had a non-delegable legal and ethical obligation to protect this information, and touted their advanced technology. For example, Clinic Defendant Shady Grove Fertility adopted and published the following text from USF:

- Our collective clinical and operational expertise provides our fertility partner practices with advanced business and digital solutions that streamline and enhance the delivery of exceptional patient care.

- We [SGF and US Fertility] offer patients every advantage to achieving a pregnancy by employing the most advanced technology, investing in research, and continually innovating approaches that improve the patient experience.[4]

47.48. Indeed, HIPAA requires the Clinic Defendants to provide every patient with a privacy notice in which the Clinic Defendants agree they will keep the medical and health information of their patients confidential and protected from unauthorized disclosure.

48.49. HIPAA also limits the use of, and prohibits unauthorized disclosure of, personal health information and requires the Clinic Defendants to implement appropriate safeguards for this information.

49.50. Both USF and the Clinic Defendants failed in their legally mandated obligations to protect the PII of Plaintiffs and the Class members.

---

[4] *About US Fertility,* https://www.shadygrovefertility.com/our-centers/why-sgf/about-us-fertility (last visited June 7, 2021).

50.51. Despite its claims of data security, including "secure, cloud-based platforms," in August 2020, USF allowed hackers to access its systems and exfiltrate sensitive patient data, including the PII of Plaintiffs and the Class.

51.52. For over a month, the hackers' presence in USF's "secure platforms" remained undetected. The hackers were free to exfiltrate data at their leisure, which they did. The data stolen includes Plaintiffs' and Class members' names, dates of birth, addresses, Social Security numbers, driver's license and state ID numbers, passport numbers, medical treatment/diagnosis information, medical record information, health insurance and claims information, credit and debit card information, and financial account information.

52.53. Finally, more than a month after the initial intrusion, USF discovered it was unable to access certain computer systems on its network due to problems caused by malicious code that had been inserted by the attackers. USF shut down several of its systems in response.

53.54. Following an investigation, USF determined the data on a number of servers and systems connected to its domain were encrypted by ransomware. USF was ultimately able to reconnect its systems on September 20, 2020, roughly six days later. USF has not disclosed whether it paid any ransom to secure access to its systems.

54.55. USF's forensic investigation by third-party computer specialists also revealed that an unauthorized third party acquired files containing the PII of Plaintiffs and the Class during a period of unauthorized access between at least August 12, 2020 and September 14, 2020.

55.56. This PII was then "leaked on the dark web."[5] This source also reports that "[s]ecurity experts say hackers might create havoc in the lives of the patients as they had access to the history, treatment and test results of the patients."[6]

56.57. This is a clear demonstration of grossly inadequate data security, particularly given the type of data involved. The length and duration of the attack shows that this was not a simple attack limited just to a small number of systems. The hackers were able to access files containing large amounts of consumer PII, what information security professionals refer to as the "crown jewels" of USF's systems, which should have been protected by the highest level of security controls. Either USF's technical information security controls were so weak that the hackers obtained unfettered network access or USF's administrative security controls failed to stop its employees from storing extraordinarily sensitive information on inadequately secured systems.

---

[5] Naveen Goud, *Ransomware attack leaks patient data of fertility clinic*, Cybersecurity Insiders, https://www.cybersecurity-insiders.com/ransomware-attack-leaks-patient-data-of-fertility-clinic/(last visited June 2, 2021).

[6] *Id.*

57.58. The timeline also indicates that the USF Data Breach was carried out by financially motivated hackers intending to distribute Plaintiffs' and Class Members' data through underground criminal networks. First, this is not a situation where hackers install malware on company computers for purposes of extortion. Malware extortion attacks are far easier to carry out and do not require hackers to spend extended amounts of time in the target company's networks. Here, the USF hackers took the time to locate and exfiltrate patient data before installing malware, which shows that they had completed the data breach undetected. Financially motivated hackers in the final stage of the "attack lifecycle" often install malware both to destroy forensic evidence that would betray their tools, techniques, and practices, and to create an additional revenue stream by charging the company to decrypt the compromised systems.

58.59. Nor does the USF Data Breach fit the profile of an attack carried out by an incredibly sophisticated hacking group acting solely for espionage purposes. Such nation-state or nation-state-sponsored hackers want to avoid detection at all costs for political and intelligence purposes. They do not install malware like the USF hackers. In other words, the limited facts that USF has released clearly indicate that USF Data Breach was perpetrated by financially motivated hackers that USF should have been able to prevent.

59.60. Had USF's data security controls been reasonable and adequate, this intrusion would have been quickly detected and the attacker expelled from USF's systems without ever exfiltrating or even accessing patient data. Thus, USF's network or system activity logging and intrusion detection systems were either well-below acceptable standards or USF was not paying any attention to what was happening in its systems.

60.61. Inexplicably waiting more than two months, in late November 2020, USF finally began notifying patients of its network of fertility clinics that it had succumbed to a ransomware attack. USF continued to send notices well into January 2021.

61.62. That USF was unable to detect its own data breach until more than a month after it started when the thieves launched a ransomware attack on the way out shows that USF's systems to detect intrusion or unusual activity and log or report such events were woefully inadequate by any standards. This is also evidence that the Clinic Defendants failed their independent and non-delegable obligation to ensure their vendors and partners employed reasonable and industry-standard data security measures.

62.63. Some of the simplest ways to minimize exposure of PII and medical information to data breaches is to limit what is provided to vendors and business associates and verify they employ adequate security measures. Yet, the Clinic

Defendants failed to do this, thus exposing a far greater number of their current and former patients to this Data Breach.

63.64. As a result of USF's and the Clinic Defendants' inadequate data security leading to the theft of sensitive PII, and as alleged more fully below, Plaintiffs and the Class have suffered, and will continue to suffer, actual instances of identity fraud, a real and imminent increased risk of identity fraud in the future, time and expense associated with responding to incidents of identity fraud and protecting against future incidents of identity fraud, diminution in the market value of their PII, and loss of the benefit of their bargain with US Fertility and the Clinic Defendants.

64.65. USF also failed to disclose to Plaintiffs and Class members that its computer/server systems and security practices were inadequate to reasonably safeguard their PII and failed to timely notify them of the data theft.

65.66. The particular details of the named Plaintiffs' damages are detailed in Section E, *infra*, but they include having unemployment benefits requested in their name, fraudulent purchases made and fake accounts opened, unauthorized charges to ride-share services, unauthorized withdrawals from bank accounts, and unauthorized password account changes.

**A.    The PII stolen in the Data Breach are considered the "Crown Jewels" of data theft. USF's data security was inadequate and it failed to notify its associates and partners of that inadequacy.**

66.67. USF failed to take adequate and reasonable measures to ensure its computer/server systems were protected against unauthorized access and failed to take actions that could have stopped the Data Breach before it occurred. This is shown, in part, by the fact that the hackers were able infiltrate USF's systems and exfiltrate data for over a month undetected. In fact, the only reason USF detected the hackers' intrusion at all is because the hackers eventually executed a ransomware scheme that blocked USF's access to its own systems.

67.68. The information exposed by USF is incredibly valuable to phishers, hackers, identity thieves, and other types of cyber criminals.

68.69. Stolen PII is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible by traditional search engines. It is difficult to police the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity. Accounts may pop up and disappear before they can be identified or traced.

69.70. The PII of consumers such as Plaintiffs and the Class members is of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity

credentials. For example, basic personal information of much less value than was taken here can be sold at a price ranging from $40 to $200.[7]

70.71. Social Security numbers are among the worst kind of personal information to have stolen because they can be misused so many different ways and are very hard to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[8]

71.72. And it is no easy task to change or cancel a stolen Social Security number. Plaintiffs and the Class members cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social

---

[7] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing /personal-data-sold-on-the-dark-web-how-much-it-costs.

[8] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 21, 2021).

Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

~~72.~~73. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[9]

~~73.~~74. Medical data, like that stolen here, is also especially valuable to identity thieves.[10]

~~74.~~75. Medical identity theft is one of the forms of identity theft that is most common and most damaging. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more "than identity thefts involving banking and finance, the government and the military, or education."[11]

---

[9] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s- hackers-has-millionsworrying-about-identity-theft.

[10] Kat Jercich, *Tens of Thousands of Patient Records Posted to Dark Web, Healthcare IT News* (Feb. 8, 2019), https://www.healthcareitnews.com/news/tens-thousands-patient-records-posted-dark-web#:~:text=%22Many%20hackers%20recognize%20the%20potential,at%20the%20secu rity%20vendor%20Centrify.

[11] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

75.76. A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[12] Almost half of medical identity theft victims lose their health care coverage as a result of the incident, while nearly one- third see their insurance premiums rise, and only forty percent are able to resolve their identity theft at all.[13]

76.77. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals – they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place."[14]

77.78. Because of this, the information compromised in the Data Breach is more valuable than the loss of, for example, credit card information in a retailer data breach. There, victims can cancel or close credit and debit card accounts. Here, the information compromised in this Data Breach—Social Security

---

[12] Elinor Mills, Study: Medical Identity Theft is Costly for Victims, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims

[13] *Id.*

[14] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

number, prescription information, name, date of birth, and addresses—is impossible to "close" and difficult, if not impossible, to change.

~~78.~~79. The data stolen in this case commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[15]

~~79.~~80. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

~~80.~~81. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[16]

---

[15] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[16] *2019 Internet Crime Report Released*, FBI News (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

**B.    USF was on notice of data breach threats and the inadequacy of its data security.**

~~81.~~82. USF was on notice that companies in the healthcare industry are frequent targets for cyberattacks and that companies storing personal health information and records need to have superior data security.

~~82.~~83. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[17]

~~83.~~84. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy

---

[17] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

and security of patients' health and financial information, but also patient access to care.[18]

~~84.~~85. And attacks against medical recordkeeping companies have skyrocketed in the past few years. A study by software company VMWare Carbon Black calculates there were 239.4 million cyberattacks on healthcare customers and providers, a 9,851% increase from 2019.[19] That same company reports, "[m]uch of the stolen data is being offered for sale on dark web sites, especially stolen protected health information . . . ."[20]

~~85.~~86. As such, USF was on notice that both the federal government and the private sector have been concerned about healthcare company data protection and encryption, and for good reason.

~~86.~~87. The United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, the DHHS's Office of Civil Rights' deputy director of health

---

[18] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[19] *VMWare Carbon Black Explores the State of Healthcare Cybersecurity in 2020*, HIPAA Journal (Feb. 8, 2021), https://www.hipaajournal.com/vmware-carbon-black-explores-the-state-of-healthcare-cybersecurity-in-2020.

[20] *Id.*

information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[21]

~~87.~~88. Despite this, Defendants did not keep the stolen data in an encrypted format, making it easy for hackers and data thieves to misuse the information once stolen. Indeed, the only encryption involved here was when hackers encrypted the PII to execute a ransomware scheme.

## C.   Defendants violated Federal Trade Commission requirements.

~~88.~~89. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[22]

~~89.~~90. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental

---

[21] U.S. Dep't of Health and Human Services, *Stolen Laptops Lead to Important HIPAA Settlements* (Apr. 22, 2014), https://wayback.archive-it.org/3926/20150618190135/http://www.hhs.gov/news/press/2014pres/04/2014042b.html.

[22] *See* Federal Trade Commission, *Start With Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

data security principles and practices for business.[23] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

90.91. Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[25]

91.92. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to

---

[23] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[24] *Id.*

[25] Federal Trade Commission, *Start With Security: A Guide for Business*, *supra* note 22.

confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[26]

92.93. Yet, Defendants did not follow the FTC guidelines. USF did not have adequate intrusion detection systems, so hackers had free run of USF's systems for more than a month while going completely undetected. USF also failed to keep the PII at issue in an encrypted format and failed to train its employees to recognize and avoid phishing scams and similar data theft techniques. And the Clinic Defendants failed to adequately protect their patients' personal and medical information and failed to ensure any business associates or vendors entrusted with the care of that information had adequate data security measures in place.

93.94. By allowing an unknown third party to access a USF server, Defendants failed to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data. Defendants' data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[26] Federal Trade Commission, Privacy and Security Enforcement Press Releases, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Jan. 21, 2021).

**D.     Defendants failed to implement one or more measures to detect and prevent ransomware attacks.**

~~94.~~95. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[27]

~~95.~~96. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[27] *See How to Protect Your Networks from Ransomware*, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited June 7, 2021).

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[28]

96.97. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and

---

[28] *Id.* at 3-4.

should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product

notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[29]

97.98. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

---

[29] *See Security Tip (ST19-001) Protecting Against Ransomware* (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[30]

98.99. Given that Defendants were storing the PII of approximately 900,000 individuals, Defendants could and should have implemented all of the above measures to prevent and detect ransomware attacks.

99.100.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of approximately 900,000 individuals, including Plaintiff and Class Members.

---

[30] See Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited June 7, 2021).

E.    **Plaintiffs and Class members have suffered ascertainable losses, economic damages, and other actual injury and harm.**

*Plaintiff Alec Vinsant's Experience*

~~100.~~101.    Plaintiff Alec Vinsant ("A. Vinsant"), while a resident of Nevada, sought treatment or services at the Nevada Center for Reproductive Medicine, which contracts with USF for IT platforms and services.

~~101.~~102.    A. Vinsant provided his PII and other confidential information to Nevada Center for Reproductive Medicine with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that he would be timely notified of any unauthorized disclosure of his private information. A. Vinsant would not have agreed to have his PII kept on USF's platforms or networks, or would have taken precautions to protect it, had he known that USF would not safeguard it.

~~102.~~103.    In January 2021, A. Vinsant received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed him of the Data Breach and that his PII, including his name, Social Security number, Patient Number/MPI and possibly his date of birth had been exposed to unauthorized third parties and compromised as a result of the Data Breach.

~~103.~~104.    Following the Data Breach, in October 2020, A. Vinsant's Social Security number was fraudulently used to apply for unemployment benefits in Nevada.

104.105.　　As a result, A. Vinsant filed a complaint with the Federal Trade Commission, filed an Internet crime complaint with the FBI, and filed a claim with the Social Security Administration. He also filed a fraud report with the Nevada Department of Employment, Training and Rehabilitation and requested they stop and flag the fraudulent claim.

105.106.　　After receipt of the Notice Letter, A. Vinsant made reasonable efforts to mitigate the impact of the Data Breach, including purchasing Zander ID Theft for which he pays a monthly fee. In addition, A. Vinsant spent time researching the Data Breach and reviewing and monitoring his credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. He has spent hours trying to contact the Nevada Department of Employment Training and Rehabilitation to inquire as to the status of the fraudulently filed unemployment claim. This is valuable time A. Vinsant otherwise would have spent on other activities.

106.107.　　A. Vinsant suffered additional actual injury from having his PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that USF obtained from A. Vinsant; (b) violation of his privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

36

*Plaintiff Marla Vinsant's Experience*

~~107.~~108.    Plaintiff Marla Vinsant ("M. Vinsant"), while a resident of Nevada, sought treatment or services at the Nevada Center for Reproductive Medicine, which contracts with USF for IT platforms and services.

~~108.~~109.    M. Vinsant provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. M. Vinsant would not have agreed to have her PII stored on USF's systems or networks, or would have taken precautions to protect her PII, had she known that USF would not safeguard it.

~~109.~~110.    In January 2021, M. Vinsant received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~110.~~111.    Following the Data Breach, in December 2020, M. Vinsant, who ordinarily has a credit score over 800, noticed that her credit score dropped 50 points.

111.112.     After receipt of the Notice letter, M. Vinsant made reasonable efforts to mitigate further impact of the Data Breach, including purchasing Zander Theft ID credit monitoring for which she pays a monthly fee. In addition, M. Vinsant spent time researching the Data Breach and reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time M. Vinsant otherwise would have spent on other activities.

112.113.     M. Vinsant suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from M. Vinsant; (b) violation of her privacy rights; and (c) further imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Jane Doe 1's Experience*

113.114.     Plaintiff Jane Doe 1 ("Doe 1") sought treatment or services at Defendant Shady Grove Fertility ("Shady Grove") in Maryland, which contracts with USF for IT platforms and services.

114.115.     Doe 1 provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Doe 1

would not have agreed to the use of Shady Grove's or USF's services, or would have taken precautions to protect her PII had she known that they would not safeguard it.

115.116.    In January 2021, Doe 1 received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

116.117.    Following the Data Breach, in March 2021, Doe 1's Social Security number was fraudulently used to apply for unemployment benefits in Maryland.

117.118.    As a result, Doe 1 placed a credit lock on her accounts, contacted the local police department, filed a report with the National Center for Disaster Fraud and contacted the Federal Trade Commission.

118.119.    After receipt of the Notice Letter, Doe 1 made reasonable efforts to mitigate further impact of the Data Breach, including purchasing Experian credit monitoring for which she pays a monthly fee. In addition, Doe 1 spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications

of actual or attempted identity theft or fraud. This is valuable time Doe 1 otherwise would have spent on other activities.

~~119.~~120.     Doe 1 suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Shady Grove and USF obtained from Doe 1; (b) violation of her privacy rights; and (c) further imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Lisa Cox's Experience*

~~120.~~121.     Plaintiff Lisa Cox ("Cox") sought treatment or services at the Reproductive Partners Fertility Center ("Reproductive Partners") in California, which contracts with USF for IT platforms and services.

~~121.~~122.     Cox provided her PII and other confidential information to Reproductive Partners with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Cox would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~122.~~123.     In January 2021, Cox received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data

Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

123.124.    Following the Data Breach, Cox has experienced an increase in daily spam calls and text messages that she blocks.

124.125.    After receipt of the Notice Letter, Cox spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Cox otherwise would have spent on other activities.

125.126.    Cox suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Cox; (b) violation of her privacy rights; and (c) further imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Nikitia Hollingsworth Forest's Experience*

126.127.    Plaintiff Nikitia Hollingsworth Forest ("Forest") sought treatment or services at Defendant Shady Grove Fertility ("Shady Grove") in Maryland, which contracts with USF for IT platforms and services

127.128.    Forest provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Forest would not have agreed to the use of Shady Grove's or USF's services, or would have taken precautions to protect her PII had she known that they would not safeguard it.

128.129.    In January 2021, Forest received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

129.130.    Following the Data Breach, an authorized purchase was made using Forest's bank card for the purchase of a vacuum cleaner from Walmart.com in another state. Forest also received notices from BB&T bank and Citibank that accounts had been opened in her name. Additionally, Forest also had approximately forty unauthorized charges from Lyft for one dollar per charge.

130.131.    As a result, Forest contacted her bank to report the unauthorized purchase from Walmart.com and the unauthorized Lyft charges.

She also contacted BB&T bank and Citibank to report the fraudulently opened accounts in her name.

~~131.~~132.    After receipt of the Notice Letter, Forest made reasonable efforts to mitigate the impact of the Data Breach, including filing for bankruptcy in order to freeze all financial activity. Forest also added fraud alerts on her accounts and credit bureaus. In addition, Forest spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Forest otherwise would have spent on other activities.

~~132.~~133.    Forest suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Shady Grove and USF obtained from Forest; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Doris Matthew's Experience*

~~133.~~134.    Plaintiff Doris Matthew ("Matthew") sought treatment or services at Shady Grove Fertility ("Shady Grove") in Virginia, which contracts with USF for IT platforms and services.

43

134.135.    Matthew provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Matthew would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

135.136.    In January 2021, Matthew received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

136.137.    Following the Data Breach, Matthew has received an increase in spam calls and texts which she blocks.

137.138.    After receipt of the Notice Letter, Matthew spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Matthew otherwise would have spent on other activities.

138.139.    Matthew suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Matthew; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Jane Doe 2's Experience*

139.140.    Plaintiff Jane Doe 2 ("Doe 2"), while a resident of Maryland, sought treatment or services at Defendant Shady Grove Fertility ("Shady Grove") in Maryland and Virginia, which contracts with USF for IT platforms and services.

140.141.    Doe 2 provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Doe 2 would not have agreed to the use of Shady Grove's or USF's services, or would have taken precautions to protect her PII, had she known that they would not safeguard it.

141.142.    In January 2021, Doe 2 received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient

45

Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

142.143.    Following the Data Breach, Doe 2 has experienced attempted fraudulent withdrawals from her bank account and an unauthorized security password change, locking her out of the account. In addition, she has received spam phone calls and texts messages.

143.144.    As a result of the unauthorized account activity, Doe 2 contacted the fraud department at her bank.

144.145.    After receipt of the Notice Letter, Doe 2 spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Doe 2 otherwise would have spent on other activities.

145.146.    Doe 2 suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Shady Grove and USF obtained from Doe 2; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Paul Porta's Experience*

~~146.~~147.    Plaintiff Paul Porta ("Porta") sought treatment or services at the Center for Reproductive Medicine in Florida, which contracts with USF for IT platforms and services.

~~147.~~148.    Porta provided his PII and other confidential information to Center for Reproductive Medicine with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that he would be timely notified of any unauthorized disclosure of his private information. Porta would not have agreed to the use of USF's services, or would have taken precautions to protect his PII had he known that USF would not safeguard it.

~~148.~~149.    In January 2021, Porta received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed him of the Data Breach and that his PII, including his name, Social Security number, Patient Number/MPI and possibly his date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~149.~~150.    After receipt of the Notice Letter, Porta spent time researching the Data Breach, reviewing and monitoring his credit reports, financial account statements, and/or medical records for any indications of actual or attempted

identity theft or fraud. This is valuable time Porta otherwise would have spent on other activities.

150.151.    Porta suffered additional actual injury from having his PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that USF obtained from Porta; (b) violation of his privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Kelly Jacobs' Experience*

151.152.    Plaintiff Kelly Jacobs ("Jacobs") sought treatment or services at Coastal Fertility Specialists in South Carolina, which contracts with USF for IT platforms and services.

152.153.    Jacobs provided her PII and other confidential information to Coastal Fertility Specialists with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Jacobs would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

153.154.    In January 2021, Jacobs received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data

Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

154.155.    Following the Data Breach, Jacobs has received calls purporting to be from Amazon.

155.156.    As a result, Jacobs changed her bank card number as a precaution.

156.157.    After receipt of the Notice Letter, Jacobs spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Jacobs otherwise would have spent on other activities.

157.158.    Jacobs suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Jacobs; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Heidi Schneider's Experience*

~~158.~~159.     Plaintiff Heidi Schneider ("Schneider") sought treatment or services at Reproductive Partners in California, which contracts with USF for IT platforms and services.

~~159.~~160.     Schneider provided her PII and other confidential information to Reproductive Partners with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Schneider would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~160.~~161.     In January 2021, Schneider received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~161.~~162.     Following the Data Breach, in October 2020, Schneider's Facebook account was hacked.

~~162.~~163.     After receipt of the Notice Letter, Schneider spent time researching the Data Breach, reviewing and monitoring her credit reports,

financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Schneider otherwise would have spent on other activities.

163.164.     Schneider suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Schneider; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Laura Petersen's Experience*

164.165.     Plaintiff Laura Petersen ("Petersen") sought treatment or services at Seattle Reproductive Medicine in Washington, which contracts with USF for IT platforms and services.

165.166.     Petersen provided her PII and other confidential information to Seattle Reproductive Medicine with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Petersen would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

166.167.      In January 2021, Petersen received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

167.168.      Following the Data Breach, Petersen has a received an increase in spam calls.

168.169.      After receipt of the Notice Letter, Petersen spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Petersen otherwise would have spent on other activities.

169.170.      Petersen suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Petersen; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Riley Fadness's Experience*

~~170.~~171.     Plaintiff Riley Fadness ("Fadness") sought treatment or services at Utah Fertility Center in Utah and Idaho, which contracts with USF for IT platforms and services.

~~171.~~172.     Fadness provided her PII and other confidential information to Utah Fertility Center with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Fadness would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~172.~~173.     In January 2021, Fadness received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~173.~~174.     Following the Data Breach, Fadness was notified of an unauthorized withdrawal of $1,000 from her bank account.

~~174.~~175.     As a result, Fadness obtained a new account number.

175.176.    After receipt of the Notice Letter, Fadness spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Fadness otherwise would have spent on other activities.

176.177.    Fadness suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Fadness; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

### Plaintiff Tiffany Hitaffer's Experience

177.178.    Plaintiff Tiffany Hitaffer ("Hitaffer") sought treatment or services at Defendant Shady Grove Fertility ("Shady Grove") in Maryland and Virginia, which contracts with USF for IT platforms and services.

178.179.    Hitaffer provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Hitaffer would not have agreed to the use of Shady Grove's or USF's services, or

would have taken precautions to protect her PII had she known that they would not safeguard it.

179.180.    In January 2021, Hitaffer received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

180.181.    After receipt of the Notice Letter, Hitaffer set alerts on her financial accounts. In addition, Hitaffer spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Hitaffer otherwise would have spent on other activities.

181.182.    Hitaffer suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Hitaffer; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Karen Logan's Experience*

~~182.~~183.     Plaintiff Karen Logan ("Logan") sought treatment or services at Defendant Shady Grove Fertility ("Shady Grove") in Maryland, which contracts with USF for IT platforms and services.

~~183.~~184.     Logan provided her PII and other confidential information to Shady Grove with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Logan would not have agreed to the use of Shady Grove's or USF's services, or would have taken precautions to protect her PII had she known that they would not safeguard it.

~~184.~~185.     In January 2021, Logan received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~185.~~186.     Following the Data Breach, in March 2021, Logan received notification that a bank account was opened in her name at Citibank.

~~186.~~187.     As a result, Logan spent time contacting Citibank to report the fraud and ensure that the account was closed.

187.188.    After receipt of the Notice letter, Logan spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Logan otherwise would have spent on other activities.

188.189.    Logan suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Shady Grove and USF obtained from Logan; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Raynard Stuckey's Experience*

189.190.    Plaintiff Raynard Stuckey ("R. Stuckey") sought treatment or services at Coastal Fertility Specialists in South Carolina, which contracts with USF for IT platforms and services.

190.191.    R. Stuckey provided his PII and other confidential information to Coastal Fertility Specialists with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that he would be timely notified of any unauthorized disclosure of his private information. R. Stuckey would not have agreed to the use of USF's services, or

57

would have taken precautions to protect his PII had he known that USF would not safeguard it.

191.192.    In January 2021, R. Stuckey received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed him of the Data Breach and that his PII, including his name, Social Security number, Patient Number/MPI and possibly his date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

192.193.    Following the Data Breach, in April 2021, R. Stuckey was notified of unauthorized purchases on his Visa card.

193.194.    As a result, the unauthorized charges were reversed, and his bank issued him a new Visa card with a different number.

194.195.    After receipt of the Notice Letter, R. Stuckey spent time researching the Data Breach, reviewing and monitoring his credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time R. Stuckey otherwise would have spent on other activities.

195.196.    R. Stuckey suffered additional actual injury from having his PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of property that USF obtained from

R. Stuckey; (b) violation of his privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Samantha Stuckey's Experience*

~~196.~~197.     Plaintiff Samantha Stuckey ("S. Stuckey") sought treatment or services at Coastal Fertility Specialists in South Carolina, which contracts with USF for IT platforms and services.

~~197.~~198.     S. Stuckey provided her PII and other confidential information to Coastal Fertility Specialists with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. S. Stuckey would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~198.~~199.     In January 2021, S. Stuckey received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~199.~~200.     Following the Data Breach, S. Stuckey has received phone calls on her home phone that someone is using her Social Security number.

200.201.　　After receipt of the Notice Letter, S. Stuckey spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time S. Stuckey otherwise would have spent on other activities.

201.202.　　S. Stuckey suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from S. Stuckey; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Britt Decker's Experience*

202.203.　　Plaintiff Britt Decker ("Decker") sought treatment at Defendant Fertility Centers of Illinois, which contracts with USF for IT platforms and services.

203.204.　　Decker provided her PII and other confidential information to Fertility Centers of Illinois with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Decker would not have agreed to the use of Fertility Centers of

Illinois' or USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~204.~~205.    In January 2021, Decker received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~205.~~206.    After receipt of the Notice Letter, Decker made reasonable efforts to mitigate further impact of the Data Breach, including putting a credit freeze on three credit bureaus. In addition, Decker spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Decker otherwise would have spent on other activities.

~~206.~~207.    Decker suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Fertility Centers of Illinois and USF obtained from Decker; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Anne Strickland's Experience*

~~207.~~208.      Plaintiff Anne Strickland ("Strickland") sought treatment or services at UNC Fertility: Raleigh-Durham-Chapel Hill ("UNC Fertility"), which contracts with USF for IT platforms and services.

~~208.~~209.      Strickland provided her PII and other confidential information to UNC Fertility with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Decker would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

~~209.~~210.      In January 2021, Strickland received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

~~210.~~211.      After receipt of the Notice Letter, Strickland spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Strickland otherwise would have spent on other activities.

211.212.    Strickland suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Strickland; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Cristielly Santana's Experience*

212.213.    Plaintiff Cristielly Santana ("Santana") sought treatment or services at the Center for Reproductive Medicine in Florida, which contracts with USF for IT platforms and services.

213.214.    Santana provided her PII and other confidential information to the Center for Reproductive Medicine with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Santana would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

214.215.    In January 2021, Santana received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient

Number/MPI, and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

215.216.    Following the Data Breach, in or about March 2021, Santana was notified by the Florida Department of Economic Opportunity that her application for unemployment benefits had been denied. However, Santana had already been receiving unemployment benefits since February.

216.217.    As a result, Santana reviewed her unemployment benefits account but was unable to find any information about the application and subsequent denial of benefits.

217.218.    Additionally, on or about April 9, 2021, Santana noticed an unauthorized charge on her debit card from Amazon Prime. She does not have an Amazon Prime account.

218.219.    After receipt of the Notice letter, Santana made reasonable efforts to mitigate further impact of the Data Breach, including notifying three credit bureaus that she was a victim of data breach. In addition, Santana spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Santana otherwise would have spent on other activities.

220.  Santana suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Santana; (b) violation of her privacy rights; and (c) further imminent and impending injury arising from the increased risk of identity theft and fraud.

*Plaintiff Patrisia Vela's Experience*

221.  Plaintiff Patrisia Vela ("Vela") sought treatment or services at Reproductive Partners in California, which contracts with USF for IT platforms and services.

222.  Vela provided her PII and other confidential information to Reproductive Partners with the understanding that it would be protected, maintained, and safeguarded from unauthorized users or disclosure, and that she would be timely notified of any unauthorized disclosure of her private information. Vela would not have agreed to the use of USF's services, or would have taken precautions to protect her PII had she known that USF would not safeguard it.

223.  In January 2021, Vela received a notice from USF dated January 8, 2021 ("Notice Letter"). The Notice Letter informed her of the Data Breach and that her PII, including her name, Social Security number, Patient Number/MPI

and possibly her date of birth had been exposed to unauthorized third parties, and compromised as a result of the Data Breach.

224.   Following the Data Breach, Vela began receiving notifications about fraudulent activity in her bank account at Chase bank. On January 26, 2021, Vela received a phone call stating they had "paperwork ready" for Vela's signature, and the caller knew Vela's full name and recited Vela's full social security number to her. The caller promptly ended the call when Vela asked for the caller's identity and the company they worked for.

225.   After receipt of the Notice Letter, Vela made reasonable efforts to mitigate further impact of the Data Breach, including putting a freeze on her credit card and financial accounts. In addition, Vela spent time researching the Data Breach, reviewing and monitoring her credit reports, financial account statements, and/or medical records for any indications of actual or attempted identity theft or fraud. This is valuable time Vela otherwise would have spent on other activities.

219.226.   Vela suffered additional actual injury from having her PII compromised in the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that USF obtained from Vela; (b) violation of her privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud.

## CLASS DEFINITIONS AND CLASS ACTION ALLEGATIONS

220.227.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following national class ("Nationwide Class"):

> All persons residing in the United States whose PII as defined herein, was compromised in the Data Breach that USF announced in November 2020.

221.228.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **California** state subclass ("California Subclass"):

> All persons whose PII was provided to a fertility clinic in California and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

222.229.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Florida** state subclass ("Florida Subclass"):

> All persons whose PII was provided to a fertility clinic in Florida and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

223.230.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Idaho** state subclass ("Idaho Subclass"):

All persons whose PII was provided to a fertility clinic in Idaho and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~224.~~231.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Illinois** state subclass ("Illinois Subclass"):

All persons whose PII was provided to a fertility clinic in Illinois and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~225.~~232.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Kansas** state subclass ("Kansas Subclass"):

All persons whose PII was provided to a fertility clinic in Kansas and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~226.~~233.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Maryland** state class ("Maryland Class"):

All persons whose PII was provided to a fertility clinic in Maryland and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

227.234.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Nevada** state subclass ("Nevada Subclass"):

> All persons whose PII was provided to a fertility clinic in Nevada and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

228.235.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **North Carolina** state subclass ("North Carolina Subclass"):

> All persons whose PII was provided to a fertility clinic in North Carolina and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

229.236.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **South Carolina** state subclass ("South Carolina Subclass"):

> All persons whose PII was provided to a fertility clinic in South Carolina and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

230.237.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Texas** state subclass ("Texas subclass"):

> All persons whose PII was provided to a fertility clinic in Texas and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~231.~~238.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Virginia** state subclass ("Virginia subclass"):

> All persons whose PII was provided to a fertility clinic in Virginia and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~232.~~239.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of the following **Washington** state subclass ("Washington subclass"):

> All persons whose PII was provided to a fertility clinic in Washington and whose PII, as defined herein, was compromised in the Data Breach that USF announced in November 2020.

~~233.~~240.     The Nationwide Class and state subclasses are collectively referred to herein as "Class" unless otherwise stated.

~~234.~~241.     Excluded from the proposed Class are the Defendants, including their corporate affiliates and any entities in which they have a controlling interest or that are controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

235.242.   Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division, or create and seek certification of additional classes, after having had an opportunity to conduct discovery.

## Numerosity

236.243.   Although the exact number of Class members is uncertain, a report submitted by USF to the U.S. Department of Health and Human Services Office for Civil Rights states the number of affected victims is 878,550. This number is clearly great enough that joinder is impracticable. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. The Class members may be identified by objective means, such as through information and records in Defendants' possession, custody, or control.

## Commonality and Predominance

237.244.   Common questions of law and fact exist as to the proposed Class members and predominate over questions affecting only individual Class members. These common questions include:

    a.  Whether Defendants engaged in the wrongful conduct alleged herein;

    b.  Whether Defendants' data security measures to protect Plaintiffs' and Class member's PII were reasonable in light of industry standards, the sensitivity of the information involved, the known threats to healthcare

data, the FTC data security recommendations, applicable cybersecurity standards, and best practices recommended by data security experts;

c. Whether Defendants violated the various state laws identified herein;

d. Whether Defendants' failure to implement adequate data security measures resulted in or was the proximate cause of the Data Breach;

e. Whether Defendants' conduct, including their failure to act, was a legal cause of the loss of PII of Plaintiffs and Class members;

f. Whether Defendants owed a legal duty to Plaintiffs and Class members to exercise due care in collecting, storing, and safeguarding their PII;

g. Whether Defendants negligently or recklessly breached legal duties owed to Plaintiffs and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

h. Whether Plaintiffs and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

i. Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

## **Typicality**

238.245.    Plaintiffs' claims are typical of the claims of the Class members. All Class members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties.

## Adequacy of Representation

239.246.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

## Superiority

240.247.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT 1

**Negligence**
**(On behalf of the Nationwide Class and all Subclasses)**
**(as against all Defendants)**

~~241.~~248.     Plaintiffs incorporate by reference all allegations in paragraphs 1 through ~~240~~247 as though fully set forth herein.

~~242.~~249.     Plaintiffs bring this claim against Defendant USF on behalf of themselves, the National Class, and all the State Subclasses. Plaintiff Decker additionally brings this claim against Defendant Fertility Centers of Illinois on behalf of herself and the Illinois Subclass. Plaintiffs Doe 1, Doe 2, Forest, and Logan bring this claim against Defendant Shady Grove Reproductive Science Center on behalf of themselves and the Maryland Subclass.

~~243.~~250.     Defendants owed a duty to Plaintiffs and the Class and applicable Subclasses (referred to in this Count as the "Class") to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing their data security systems to ensure that Plaintiffs' and Class members' PII in Defendants' possession was adequately

secured and protected. Defendants also owe a duty to ensure that they have adequate intrusion detection systems so that they can timely detect intrusions into their systems and networks and can take appropriate corrective action.

244.251.   Additionally, Defendants owe a duty to confirm that any affiliates, vendors, or third parties whom Defendants are entrusting to manage, store, and secure the PII provided to Defendants by their customers have adequate security for that PII, follow industry standards and laws relating to safeguarding PII, have properly segregated that PII and kept each clinic's PII separate, have securely encrypted that PII, and otherwise prioritize data security in a way that will ensure the PII is secure from cyber threats and malicious actors.

245.252.   Defendants owed a duty of care to Plaintiffs and members of the Class because they were foreseeable and probable victims of any inadequate data security practices. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and Class members and the critical importance of adequately securing such information.

246.253.   Plaintiffs and members of the Class entrusted Defendants with their PII with the understanding that Defendants would safeguard their information. Defendants were in a position to protect against the harm suffered

by Plaintiffs and members of the Class as a result of the Data Breach whereas Plaintiffs were dependent on Defendants for that protection.

247.254.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiffs and Class members. Defendants' misconduct included failing to implement the systems, policies, and procedures necessary to prevent the Data Breach, failing to properly encrypt the PII, failing to implement systems that could timely detect intrusions into their systems by threat actors, failing to train their personnel to recognize and respond to data security risks, or failing to ensure that parties entrusted by Defendants to store, manage, and secure the PII of Plaintiffs and the Class had those systems and procedures in place.

248.255.    Defendants knew, or should have known, of the risks inherent in collecting and storing PII and the importance of adequate security. Defendants knew about – or should have been aware of - numerous, well-publicized data breaches affecting healthcare businesses or businesses that store healthcare records in the United States.

249.256.    Defendants also had independent duties under state and federal laws that required Defendants to reasonably safeguard Plaintiffs' and Class members' PII. These duties are non-delegable.

250.257.     Defendants breached their duties to Plaintiffs and Class members by failing to provide reasonable or adequate computer systems and data security to safeguard the PII of Plaintiffs and Class members.

251.258.     Furthermore, the Clinic Defendants negligently entrusted Plaintiffs' and the Class members' PII to USF without taking adequate steps to ensure USF had the systems and protocols in place to protect that PII from theft or disclosure.

252.259.     Through Defendants' acts and omissions, including Defendants' failure to provide adequate security and its failure to protect Plaintiffs' and Class members' PII from being foreseeably accessed, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the PII of Plaintiffs and Class members.

253.260.     In engaging in the negligent acts and omissions as alleged herein, which permitted an unknown third party to exfiltrate Plaintiffs' and Class members' PII and then misuse it, Defendants violated Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures and failing to protect Plaintiffs' and Class members' PII.

254.261.     Plaintiffs and the Class members are among the class of persons Section 5 of the FTC Act was designed to protect, and the injuries

suffered by Plaintiffs and the Class members is the type of injury Section 5 of the FTC Act was intended to prevent.

255.262.    Neither Plaintiffs nor any of the Class members contributed to the Data Breach as described in this Complaint.

256.263.    As a direct and proximate cause of Defendants' negligent conduct, Plaintiffs and Class members have suffered and/or will suffer injury and damages, including: (i) actual instances of identity fraud or similar misuse of their PII; (ii) loss of their benefit of the bargain with Defendants; (iii) the publication, theft, or misuse of their PII, including many instances of identity fraud or similar misconduct; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (viii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect

that PII in its continued possession; and, (ix) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives.

257.264.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and the Class members are entitled to recover damages, including actual, consequential, and nominal damages.

## COUNT 2

**Unjust Enrichment**
**(On behalf of the Nationwide Class and all Subclasses)**
**(as against all Defendants)**

258.265.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 257 264 as though fully set forth herein.

259.266.    Plaintiffs bring this claim against Defendant USF on behalf of themselves, the National Class, and all the State Subclasses. Plaintiff Decker additionally brings this claim against Defendant Fertility Centers of Illinois on behalf of herself and the Illinois Subclass. And Plaintiffs Doe 1, Doe 2, Forest, and Logan bring this claim against Defendant Shady Grove on behalf of themselves and the Maryland Subclass.

260.267.    Plaintiffs and members of the Class conferred a monetary benefit on Defendants. Specifically, Plaintiffs and Class members paid for

services at the Clinic Defendants and other fertility clinics which, in turn, pay Defendant USF for administrative, clinical, and business services, and provided and entrusted their PII to those Defendants.

261.268.    In exchange, Plaintiffs and Class members should have received from Defendants their expected goods and services, such as the security of their PII, and should have been entitled to have Defendants protect their PII with adequate data security, and timely notice of the Data Breach.

262.269.    Defendants appreciated, accepted, and retained the benefit bestowed on them under inequitable and unjust circumstances arising from Defendants' conduct toward Plaintiffs and Class members as described herein; Plaintiffs and Class members conferred a benefit on Defendants, and Defendants accepted or retained that benefit. Defendants profited from the services Plaintiffs and Class members paid for and used Plaintiffs' and Class members' PII for business purposes.

263.270.    Defendants failed to secure Plaintiffs' and Class members' PII and therefore, did not provide full compensation for the monetary benefit Plaintiffs and Class members conferred on Defendants.

264.271.    Defendants acquired the PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

265.272.    Had Plaintiffs and Class members known that Defendants would not secure their PII using adequate security, they would not have chosen to receive care from the Clinic Defendants and other fertility clinics to whom Defendant USF provides services.

266.273.    Plaintiffs and Class members have no adequate remedy at law.

267.274.    Under these circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

268.275.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class.

## COUNT 3

**Breach of Confidence**
**(On behalf of the Nationwide Class and all Subclasses)**
**(as against all Defendants)**

269.276.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 268 275 as though fully set forth herein.

270.277.    Plaintiffs bring this claim against Defendant USF on behalf of themselves, the National Class, and all the State Subclasses. Plaintiff Decker additionally brings this claim against Defendant Fertility Centers of Illinois on

behalf of herself and the Illinois Subclass. And Plaintiffs Doe 1, Doe 2, Forest, and Logan bring this claim against Defendant Shady Grove on behalf of themselves and the Maryland Subclass.

271.278.    At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' PII that Plaintiffs and Class Members provided to Defendant.

272.279.    Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed the unauthorized third parties.

273.280.    Plaintiffs and Class Members provided their PII to Defendants with the explicit and implicit understanding that Defendants would protect and not permit the PII to be disseminated to any unauthorized parties.

274.281.    Defendants voluntarily received in confidence Plaintiffs' and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

275.282.    Due to Defendant's failure to prevent, detect, and avoid the Data Breach from happening by following best information security practices to secure Plaintiffs' and Class Members' PII, Plaintiffs' and Class Members' PII was

disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

276.283.    As a direct and proximate cause of Defendants' actions and omissions, Plaintiffs and Class Members have suffered the damages alleged below.

277.284.    But for Defendants' disclosure of Plaintiffs' and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and misused by unauthorized third parties. Defendants' disclosure through the Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' PII, as well as the resulting damages.

278.285.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' PII. Defendants knew their systems and technologies for accepting and securing Plaintiffs' and Class Members' PII had numerous security and other vulnerabilities that placed Plaintiffs' and Class Members' PII in jeopardy.

279.286.    As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the compromise,

publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession; and (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

280.287.      As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Class members are entitled to recover damages, including actual, consequential, and nominal damages.

## COUNT 4

**Declaratory and Injunctive Relief**
**(On behalf of the Nationwide Class and all Subclasses)**
**(as against all Defendants)**

281.288.      Plaintiffs incorporate by reference all allegations in paragraphs 1 through 280 287 as though fully set forth herein.

282.289.     Plaintiffs bring this claim against Defendant USF on behalf of themselves, the National Class, and all the State Subclasses. Plaintiff Decker additionally brings this claim against Defendant Fertility Centers of Illinois on behalf of herself and the Illinois Subclass. And Plaintiffs Doe 1, Doe 2, Forest, and Logan bring this claim against Defendant Shady Grove on behalf of themselves and the Maryland Subclass.

283.290.     As previously alleged, Defendants owe duties of care to Plaintiffs and Class members that require Defendants to adequately secure the PII entrusted to them.

284.291.     Defendants still possesses the PII pertaining to Plaintiffs and the Class Members

285.292.     Defendants have made no announcement or notification that they have remedied the vulnerabilities in their practices and policies about ensuring the data security of Plaintiffs and the Class members' PII.

286.293.     Accordingly, Defendants have not satisfied their legal obligations and duties to Plaintiffs and the Class members. On the contrary, now that Defendants' lax approach towards data security has become public, the PII in their possession is more vulnerable than it was prior to announcement of the Data Breach.

287.294.      Actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide data security measures to Plaintiffs and the Class members, including the fact that Class Members' PII is being distributed through criminal networks.

288.295.      Plaintiffs, therefore, seek a declaration that Defendants' existing data security measures do not comply with their obligations and duties of care, and to comply with their obligations and duties of care, Defendant must implement and maintain reasonable security measures, including those set forth in the prayer below.

## COUNT 5

**Breach of Contracts to which Plaintiffs and the Class are
third party beneficiaries
(On behalf of the Nationwide Class and all Subclasses)
(as against Defendant USF)**

289.296.      Plaintiffs incorporate by reference all allegations in paragraphs 1 through 288 295 as though fully set forth herein.

290.297.      At all times relevant, Defendant USF had express or implied contracts or agreements with several fertility clinics and other medical entities to provide services including secure patient data and records management, retention, retrieval, and storage.

291.298.      Plaintiffs and the members of the Class are intended third-party beneficiaries of contracts entered into between Defendant USF and these

fertility clinics and other business entities because it is their PII that is one of the subjects of the contracts and for which Defendant USF agreed to provide secure patient data and records management, retention, retrieval, and storage.

292.299.   As alleged previously, Defendant USF breached these contracts by failing to provide secure or adequate data storage services, resulting in the Data Breach and the theft and misuse of the PII of Plaintiffs and the Class by unauthorized third persons.

293.300.   Plaintiffs and the members of the Class have a right to recovery for breach because one or more of the parties to these contracts intended to give Plaintiffs and the Class members the benefit of the performance promised in the contracts.

294.301.   As a direct and proximate result of Defendant's breaches of these contracts, Plaintiffs and the Class members suffered the injuries as described in detail above.

295.302.   As a direct and proximate result of Defendant's breaches of these contracts, Plaintiffs and the Class members are entitled to recover damages, including actual, consequential, and nominal damages.

## STATE SUBCLASS COUNTS

## COUNT 6

**Violations of California's Confidentiality of Medical Information Act
("CMIA")
California Civil Code section 56,** *et seq.*
**(As to the California Subclass only)
(as against Defendant USF)**

~~296.~~303.    Plaintiffs   Cox, ~~and~~ Schneider, and Vela ("California

Plaintiffs") incorporate by reference the allegations in paragraphs 1 through ~~295~~

302 as though fully set forth herein.

~~297.~~304.    Defendant is a "provider of health care" as defined in Civil

Code section 56.05, subds. (h) and (m).

~~298.~~305.    California Plaintiffs are "patients" of Defendant as defined in

Civil Code section 56.05, subd. (k).

~~299.~~306.    California   Plaintiffs   and   the   California   Subclass   are

"endanger[ed]" within the meaning of Civil Code § 56.05(e) because those

Plaintiffs and the California Subclass fear that disclosure of their medical

information could subject them to harassment or abuse. Furthermore, California

Plaintiffs and the California Subclass, as patients of Defendant, had their

individually identifiable "medical information," within the meaning of Civil

Code § 56.05(j), created, maintained, preserved, and stored on Defendant's

computer network, and were patients on or before August 2020.

300.307.    Defendant negligently created, maintained, preserved, stored, and then exposed California Plaintiffs' and the California Subclass members' individual identifiable "medical information," within the meaning of Civil Code § 56.05(j), including those Plaintiffs' and the California Subclass members' treatment information.

301.308.    Defendant negligently created, maintained, preserved, stored, and released California Plaintiffs' and the California Subclass's medical information in violation of Civil Code section 56.101, subd. (a).

302.309.    As a result of this negligence, California Plaintiffs' and the California Subclass's information was stolen and viewed by unauthorized third parties in the Data Breach. Fraudulent use of the exfiltrated PII has already begun, as Plaintiff Vela received at least one fraudulent call by an unknown party who knew her full name and complete Social Security number.

310.    Because Civil Code § 56.101 allows for the remedies and penalties provided under Civil Code § 56.36(b), California Plaintiffs, individually and for each member of the California Subclass, seeks statutory damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2) and damages provided by the common law.

## COUNT 7

**Violations of the Maryland Consumer Protection Act,
Md. Comm. Code §§ 13-301, *et seq.*
(As to the Maryland Subclass only)
(as against Defendants USF and Shady Grove Reproductive Science Center)**

303.311.    Plaintiffs Doe 1, Doe 2, Forrest, and Logan ("Maryland Plaintiffs") hereby incorporate by reference all allegations in paragraphs 1 through 303 310 as though fully alleged herein.

304.312.    Maryland Plaintiffs and the Maryland Subclass are "consumers" under Md. Comm. Code § 13-101(c).

305.313.    Defendants are "persons" under Md. Comm. Code § 13-101(h) and offer, advertise, or sell "consumer services" as defined in Md. 13-101(d).

306.314.    Defendants engaged in the acts and omissions alleged herein in the state of Maryland.

307.315.    Defendants engaged in unfair and deceptive acts and practices in violation of the Maryland Consumer Protection Act, including failing to state a material fact where the failure deceives or tends to deceive, advertising or offering consumer goods or services without the intent to sell or provide them as advertised, and misrepresentation, concealment, suppression, or omission of a material fact with the intent that a consumer rely on the same in connection with the sale of consumer services or the subsequent performance with respect to an agreement, sale, lease, or rental.

308.316.    Defendants engaged in these acts or omissions by failing to comply with common law and statutory requirements for adequate data security, including Section 5 of the FTC Act and the Maryland Personal Information Protection Act, Md. Comm. Code § 14-3503.

309.317.    Maryland Plaintiffs and the Maryland Subclass acted reasonably in replying on Defendants' misrepresentations and omissions, described fully, supra, the truth of which they could not have discovered.

310.318.    As a result of Defendants' unfair and deceptive acts and practices, Maryland Plaintiffs and the Maryland Subclass have suffered and will continue to suffer injury, losses of money or property, and monetary and non-monetary damages as alleged more fully above.

311.319.    Maryland Plaintiffs and the Maryland Subclass seek all relief allowed under law for these violations, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

## COUNT 8

**Violations of the Maryland Personal Information Protection Act, Md. Code Ann. §§ 14-3501, et seq.**
**(As to the Maryland Subclass only)**
**(as to Defendants USF Shady Grove Reproductive Science Center)**

312.320.    Plaintiffs Doe 1, Doe 2, Forrest, and Logan ("Maryland Plaintiffs") hereby incorporate by reference all allegations in paragraphs 1 through 312 319 as though fully alleged herein.

313.321.    Under the Maryland Personal Information Protection Act ("MPIPA"), Md. Code Ann., Com. Law, § 14-3503(a), "[t]o protect Personal Information from unauthorized access, use, modification, or disclosure, a business that owns or licenses Personal Information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of Personal Information owned or licensed and the nature and size of the business and its operations."

314.322.    Defendants are businesses that own or license computerized data that includes Personal Information as defined by Md. Code Ann., Com. Law, § 14- 3501(b)(1).

315.323.    Maryland Plaintiffs and Maryland Subclass members are "individuals" and "customers" as defined in Md. Code Ann., Com. Law, §§ 14-3502(a) and 14-3503.

316.324.    Maryland Plaintiffs' and Maryland Subclass members' Personal Information includes "[h]ealth information" and "[p]ersonal information" as covered under Md. Code Ann., Com. Law, §§ 14-3501(d)-(e).

317.325.    Defendants did not maintain reasonable security procedures and practices appropriate to the nature of the Personal Information owned or licensed and the nature and size of its business and operations in violation of Md. Code Ann., Com. Law, § 14-3503.

318.326.     The Data Breach was a "breach of the security system" as defined by Md. Code Ann., Com. Law, § 14-3504(1).

319.327.     Under Md. Code Ann., Com. Law, § 14-3504(b)(1), "[a] business that owns or licenses computerized data that includes Personal Information of an individual residing in the State, when it discovers or is notified of a breach of the security system, shall conduct in good faith a reasonable and prompt investigation to determine the likelihood that Personal Information of the individual has been or will be misused as a result of the breach."

320.328.     Under Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2), "[i]f, after the investigation is concluded, the business determines that the breach of the security of the system creates a likelihood that personal information has been or will be misused, the owner or licensee of the computerized data shall notify the individual of the breach" and that notification "shall be given as soon as reasonably practical but not later than 45 days after the business discovers or is notified of the breach of a security system."

321.329.     Because Defendant USF discovered a security breach and had notice of the security breach, Defendant USF had an obligation to disclose the security data breach in a timely and accurate fashion as mandated by Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2).

322.330.      Defendant USF failed to discover the Data Breach for over one month after and then waited an additional two months before notifying Maryland Plaintiffs and Maryland Subclass members. By failing to disclose the Data Breach in a timely and accurate manner, Defendant USF violated Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2).

323.331.      As a direct and proximate result of Defendants' violations of Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2), Maryland Plaintiffs and Maryland Subclass members have suffered and will continue to suffer damages.

324.332.      Pursuant to Md. Code Ann., Com. Law, § 14-3508, Defendants' violations of Md. Code Ann., Com. Law, §§ 14-3504(b)(2) and 14-3504(c)(2) are unfair or deceptive trade practices within the meaning of the Maryland Consumer Protection Act (codified at Md. Code Ann., Com. Law, § 13-301 et seq.) ("CPA") and are subject to the enforcement and penalty provisions contained within the CPA.

325.333.      Maryland Plaintiffs and Maryland Subclass members seek relief under Md. Code Ann., Com. Law, § 14-3508, including actual damages and attorneys' fees.

## COUNT 9

**Violations of Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. Ann. §§ 598.0903 *et seq.***
**(As to the Nevada Subclass only)**
**(As to Defendant USF)**

326.334.    Plaintiffs Vinsant ("Nevada Plaintiffs") hereby incorporate by reference all allegations in paragraphs 1 through 326 333 as though fully set forth herein.

327.335.    Defendant USF advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

328.336.    Defendant engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including:

    a.  Knowingly making a false representation as to the characteristics, uses, and benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5);

    b.  Representing that goods or services for sale are of a particular standard, quality, or grade when Defendant knew or should have known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

95

c. Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat § 598.0915(9);

d. Failing to disclose a material fact in connection with the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(2); and

e. Violating state and federal statutes or regulations relating to the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(3).

329.337.      Defendant's deceptive trade practices in the course of its business or occupation include: (1) failing to implement and maintain reasonable security and privacy measures to protect Nevada Plaintiffs' and Nevada Subclass members' PII; (2) failing to comply with common law and statutory duties pertaining to the security and privacy of Nevada Plaintiffs' and Nevada class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat. § 603A.210, which was a direct and proximate cause of the Data Breach; (3) misrepresenting that it would protect the privacy and confidentiality of Nevada Plaintiffs' and Nevada class members' PII, including by implementing and maintaining reasonable security measures; (4) misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Nevada Plaintiffs' and Nevada class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat.

§ 603A.210; (5) omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Nevada Plaintiffs' and Nevada class members' PII; and (6) omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Nevada Plaintiffs' and class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Nevada's data security statute, Nev. Rev. Stat. § 603A.210.

~~330.~~338.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

~~331.~~339.    Had Defendant disclosed to Nevada Plaintiffs and Nevada Subclass members or fertility clinics that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Nevada Plaintiffs' and Nevada Subclass members' PII as part of the services Defendant provided and for which those Plaintiffs and Subclass members paid without advising them that Defendant's data security practices were insufficient. Accordingly, Nevada Plaintiffs and the Nevada Subclass

members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

332.340. Defendant acted intentionally, knowingly, and maliciously to violate Nevada's Deceptive Trade Practices Act, and recklessly disregarded Nevada Plaintiffs' and Nevada Subclass members' rights.

333.341. As a direct and proximate result of Defendant's deceptive trade practices, Nevada Plaintiffs and Nevada Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

334.342. Nevada Plaintiffs and Nevada Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, and attorneys' fees and costs.

## COUNT 10

**Violations of Virginia Personal Information Data Breach Notification Act,
Va. Code Ann. §§ 18.2-186.6 *et seq.*
(As to the Virginia Subclass only)
(As to Defendant USF)**

~~335.~~343.    Plaintiffs Matthew and Hitaffer ("Virginia Plaintiffs") hereby incorporate by reference all allegations in paragraphs 1 through ~~335~~ 342 as though fully set forth herein.

~~336.~~344.    Defendant USF is required to accurately notify Virginia Plaintiffs and the Virginia Subclass members following discovery or notification of a breach of their data security if unencrypted or unredacted Personal Information was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identity theft or another fraud, without unreasonably delay under Va. Code Ann §18.2-186.6(B).

~~337.~~345.    Defendant is an entity that owns, licenses, or maintains computerized data that includes Personal Information as defined by Va. Code Ann. §§18.2- 186.6(B), (D).

~~338.~~346.    Virginia Plaintiffs' and Virginia Subclass members' PII includes Personal Information as covered under Va. Code Ann. §18.2-186.6(A).

~~339.~~347.    Because Defendant discovered a breach of their security system in which unencrypted or unredacted PII was or is reasonably believed to

have been accessed and acquired by an unauthorized person, who will, or it is reasonably believed who will, engage in identity theft or another fraud, Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Va. Code Ann. §§18.2-186.6(B), (D).

340.348.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Va. Code Ann. §§18.2-186.6(B), (D).

341.349.    As a direct and proximate result of Defendant's violations of Va. Code Ann. §18.2-186.6(B), (D), Virginia Plaintiffs and Virginia Subclass members suffered damages, as described above.

342.350.    Virginia Plaintiffs and Virginia Subclass members seek relief under Va. Code Ann. §18.2-186.6(I), including actual damages.

## COUNT 11

**Violations of Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §§ 501.201, *et seq.***
**(As to the Florida Subclass only)**
**(As to Defendant USF)**

343.351.    Plaintiffs Porta and Santana ("Florida Plaintiffs") hereby incorporate by reference all allegations in paragraphs 1 through 343350 as though fully set forth herein.

344.352.    Defendant USF advertised, offered, or sold goods or services in Florida and engaged in commerce affecting Florida residents, including Florida Plaintiffs and members of the Florida Subclass.

345.353.        The Florida Plaintiffs and the members of the Florida Subclass are consumers as defined in the FDUTPA, Fla. Stat. § 501.203.

346.354.        Defendant USF engaged in unfair, unconscionable, and deceptive acts and practices in violation of the FDUTPA, Fla. Stat. § 501.203, including: (1) Failing to identify foreseeable risks to the security and privacy of the Florida Plaintiffs' and Florida Subclass's PII, failure to fix or correct the identified security and privacy risks, failing to bring its data security and privacy practices up to industry standards or the standards required by law despite the known threats to the security of PII and medical data; (2) failing to implement reasonable security measures to protect the PII of Florida Plaintiffs and members of the Florida Subclass; (3) failing to comply with industry standards for data security and failing to meet the requirements and duties for data security established by law, including those set forth in the FTC Act and Florida's data security statute, Fla. Stat. § 501.171(2); deceptively representing, either through affirmative misrepresentation or omission, that USF would comply with industry standards and legal duties relating to data security and retention even though USF did not comply with such measures and duties, including those identified above, and did not adequately secure the Florida Plaintiffs' and the Florida Subclass members' PII.

347.355.    USF's misrepresentations and omissions were material because they were reasonably likely to deceive reasonable consumers about the adequacy of USF's data security measures and compliance with laws and standards relating to that data security.

348.356.    The Florida Plaintiffs and members of the Florida Subclass acted reasonably in relying on the misrepresentations and omissions of Defendant USF and could not reasonably have uncovered the falsity of those misrepresentations and omissions.

349.357.    The above-listed unfair, unconscionable, and deceptive acts and practices in violation of the FDUTPA were the direct and proximate cause of the Data Breach and the injuries suffered by the Florida Plaintiffs and members of the Florida Subclass, as detailed previously.

350.358.    Had USF disclosed to the Florida Plaintiffs and members of the Florida Subclass that their PII would not be kept secure and would be subject to theft, the Florida Plaintiffs and members of the Florida Subclass would not have provided their PII to fertility clinics that used USF's services and thus would not have provided their PII to USF.

351.359.    The Florida Plaintiffs and the Florida Subclass seek all monetary and equitable relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.211, declaratory and injunctive relief, attorneys'

fees and costs pursuant to Fla. Stat. § 501.2105(1), and any other relief available under the FUDTPA.

## COUNT 12

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"),**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(As to the Illinois Subclass only)**
**(As to Defendants USF and Fertility Centers of Illinois, S.C.~~bam~~)**

~~352.~~360.    Plaintiff Decker ("Illinois Plaintiff") hereby incorporates by reference all allegations in paragraphs 1 through ~~352~~ 359 as though fully set forth herein.

~~353.~~361.    Illinois Plaintiff and the members of the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Illinois Plaintiff, members of the Illinois Subclass, and Defendants USF and Fertility Centers are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

~~354.~~362.    Defendants USF and Fertility Centers are engaged in "trade" or "commerce", including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants USF and Fertility Centers engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

~~355.~~363.    Defendants USF and Fertility Centers engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and

omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (1) failing to maintain adequate data security to keep the Illinois Plaintiff's and the Illinois Subclass members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to the Illinois Plaintiff and the Illinois Subclass regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the PII of the Illinois Plaintiff and the Illinois Subclass; (3) failing to disclose or omitting materials facts to the Illinois Plaintiff and the Illinois Subclass about Defendants' failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of the Illinois Plaintiff and the Illinois Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the Illinois Plaintiff and the Illinois Subclass members' PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

356.364.    These actions also constitutes deceptive and unfair acts or practices because Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by the Illinois

Plaintiff and the Illinois Subclass, and defeat their reasonable expectations about the security of their PII.

357.365.    Defendants intended that the Illinois Plaintiff and the Illinois Subclass members rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

358.366.    Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to all Illinois Subclass members. the Illinois Plaintiff and the Illinois Subclass members have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

359.367.    Defendants also violated 815 ILCS 505/2 by failing to immediately notify the Illinois Plaintiff and the Illinois Subclass of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et. seq.*

360.368.    As a result of Defendants' wrongful conduct, the Illinois Plaintiff and the Illinois Subclass members were injured in that they never would have provided their PII to Defendants, or purchased Defendants' services, had they known or been told that Defendants failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

361.369.     As a direct and proximate result of Defendants' violations of the CFA, the Illinois Plaintiff and the Illinois Subclass members have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments made to Defendants that the Illinois Plaintiff and the Illinois Subclass members would not have made had they known of Defendants' inadequate data security; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

362.370.     Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the CFA.

## COUNT 13

**Violations of Washington Consumer Protection Act ("WCPA"),
RCW §§ 19.86.020, *et seq.*
(As to the Washington Subclass only)
(As to Defendant USF)**

363.371.     Plaintiff Petersen ("Washington Plaintiff") hereby incorporates by reference all allegations in paragraphs 1 through 363 370 as though fully set forth herein.

106

364.372.     RCW § 19.86.020, part of the WCPA, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…" Pursuant to RCW § 19.86.090, "[a]ny person who is injured in his or her business or property" by a violation of the WCPA may bring a civil suit for injunctive relief, damages, attorney fees and costs, and, potentially, treble damages.

365.373.     Defendant USF engaged in unfair and deceptive acts and practices in trade or commerce, including: (1) failing to maintain adequate data security to keep the Washington Plaintiff's and the Washington Subclass members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to the Washington Plaintiff and the Washington Subclass about its lack of adequate data security and inability or unwillingness to properly secure and protect the PII of the Washington Plaintiff and the Washington Subclass; (3) failing to disclose or omitting materials facts to the Washington Plaintiff and the Washington Subclass about USF's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of the Washington Plaintiff and the Washington Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security

measures and protect the Washington Plaintiff and the Washington Subclass members' PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

366.374.    These actions also constitutes deceptive and unfair acts or practices because USF knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by the Washington Plaintiff and the Washington Subclass, and defeat their reasonable expectations about the security of their PII.

367.375.    USF's wrongful practices affected the public interest because those practices were part of USF's generalized course of conduct that applied to all Washington Subclass members. The Washington Plaintiff and the Washington Subclass members have been adversely affected by USF's misconduct and the public was and is at risk from it.

368.376.    The Washington Plaintiff and the Washington Subclass members would not have provided their PII to USF or its affiliated clinics had they known or been told that USF failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

369.377.    As a direct and proximate result of USF's violations of the WCPA, the Washington Plaintiff and the Washington Subclass members have

suffered harm and been injured in their property, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments made to USF or its affiliates and partners that the Washington Plaintiff and the Washington Subclass members would not have made had they known of USF's inadequate data security; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

370.378.    Pursuant to RCW § 19.86.090, the Washington Plaintiff and the Washington Subclass request injunctive relief, damages, attorney fees and costs, and treble damages.

## COUNT 14

### Violations of North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA"), N.C. Gen. Stat. §§ 75-1.1, *et seq.*
### (As to the North Carolina Subclass only)
### (As to Defendant USF)

371.379.    Plaintiff Strickland ("North Carolina Plaintiff") hereby incorporates by reference all allegations in paragraphs 1 through 371 378 as though fully set forth herein.

372.380.    N.C.G.S. 75-1.1, part of the NC UDTPA, prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. Pursuant to N.C.G.S. 75-16, any individual who has been "injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter" may bring a civil action.

373.381.    Defendant USF engaged in unfair and deceptive acts and practices in trade or commerce, including: (1) failing to maintain adequate data security to keep the North Carolina Plaintiff's and the North Carolina Subclass members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to the North Carolina Plaintiff and the North Carolina Subclass about its lack of adequate data security and inability or unwillingness to properly secure and protect the PII of the North Carolina Plaintiff and the North Carolina Subclass; (3) failing to disclose or omitting materials facts to the North Carolina Plaintiff and the North Carolina Subclass about USF's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of the North Carolina Plaintiff and the North Carolina Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the North Carolina Plaintiff

and the North Carolina Subclass members' PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

374.382.   These actions also constitutes deceptive and unfair acts or practices because USF knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by the North Carolina Plaintiff and the North Carolina Subclass, and defeat their reasonable expectations about the security of their PII.

375.383.   The North Carolina Plaintiff and the North Carolina Subclass members would not have provided their PII to USF or its affiliated clinics had they known or been told that USF failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

376.384.   As a direct and proximate result of USF's violations of the NC UDTPA, the North Carolina Plaintiff and the North Carolina Subclass members have suffered harm and been injured in their property, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments made to USF or its affiliates and partners that the North Carolina Plaintiff and the North Carolina Subclass members would not have made had they known of USF's inadequate data security; lost control over

the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

377.385.    Pursuant to N.C.G.S. 75-16, the North Carolina Plaintiff and the North Carolina Subclass request injunctive relief, damages, attorney fees and costs, and treble damages.

## COUNT 15

**Violations of Idaho Consumer Protection Act ("ICPA"),**
**Idaho Code §§ 48-601, et seq. (As to the Idaho Subclass only)**
**(As to Defendant USF)**

378.386.    Plaintiff Fadness ("Idaho Plaintiff") hereby incorporates by reference all allegations in paragraphs 1 through 378 385 as though fully set forth herein.

379.387.    Idaho Code § 48-601, part of the ICPA, prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

380.388.    Defendant USF engaged in unfair and deceptive acts and practices in trade or commerce, including: (1) failing to maintain adequate data security to keep the Idaho Plaintiff's and the Idaho Subclass members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable

state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to the Idaho Plaintiff and the Idaho Subclass about its lack of adequate data security and inability or unwillingness to properly secure and protect the PII of the Idaho Plaintiff and the Idaho Subclass; (3) failing to disclose or omitting materials facts to the Idaho Plaintiff and the Idaho Subclass about USF's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of the Idaho Plaintiff and the Idaho Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the Idaho Plaintiff and the Idaho Subclass members' PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

381.389.    These actions also constitutes deceptive and unfair acts or practices because USF knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by the Idaho Plaintiff and the Idaho Subclass, and defeat their reasonable expectations about the security of their PII.

382.390.    The Idaho Plaintiff and the Idaho Subclass members would not have provided their PII to USF or its affiliated clinics had they known or been

told that USF failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

383.391.    As a direct and proximate result of USF's violations of the ICPA the Idaho Plaintiff and the Idaho Subclass members have suffered harm and been injured in their property, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments made to USF or its affiliates and partners that the Idaho Plaintiff and the Idaho Subclass members would not have made had they known of USF's inadequate data security; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

384.392.    Pursuant to Idaho Code § 48-606 through 48-608, the Idaho Plaintiff and the Idaho Subclass request injunctive relief, damages, and attorney fees and costs.

## COUNT 16

**Violations of Utah Consumer Sales Practices Act ("UCSPA"),**
**Utah Code §§ 13-11-1, *et seq.***
**(As to the Utah Subclass only)**
**(As to Defendant USF)**

~~385.~~393.    Plaintiff Fadness ("Utah Plaintiff")[31] hereby incorporates by reference all allegations in paragraphs 1 through ~~385~~ 392 as though fully set forth herein.

~~386.~~394.    Utah Code §§ 13-11-4 and 13-11-5, part of the UCSPA, prohibit unfair or unconscionable acts and unfair or deceptive acts or practices in or affecting commerce.

~~387.~~395.    Defendant USF engaged in unconscionable, unfair and deceptive acts and practices in trade or commerce, including: (1) failing to maintain adequate data security to keep the Utah Plaintiff's and the Utah Subclass members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to the Utah Plaintiff and the Utah Subclass about its lack of adequate data security and inability or unwillingness to properly secure and protect the PII of the Utah Plaintiff and the Utah Subclass; (3) failing to disclose or omitting materials facts to the Utah Plaintiff and the Utah Subclass about

---

[31] Plaintiff Fadness sought services in both Idaho and Utah and therefore serves as the class representative for both state subclasses.

USF's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of the Utah Plaintiff and the Utah Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect the Utah Plaintiff and the Utah Subclass members' PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

388.396.    These actions also constitute unconscionable, deceptive, and unfair acts or practices because USF knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by the Utah Plaintiff and the Utah Subclass, and defeat their reasonable expectations about the security of their PII.

389.397.    The Utah Plaintiff and the Utah Subclass members would not have provided their PII to USF or its affiliated clinics had they known or been told that USF failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

390.398.    As a direct and proximate result of USF's violations of the UCSPA, the Utah Plaintiff and the Utah Subclass members have suffered harm and been injured in their property, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money

obtaining protections against future identity theft; financial losses related to the payments made to USF or its affiliates and partners that the Utah Plaintiff and the Utah Subclass members would not have made had they known of USF's inadequate data security; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

391.399.    Pursuant to Utah Code §§ 13-11-17 through 13-11-19, the Utah Plaintiff and the Utah Subclass request equitable and injunctive relief, damages, and attorney fees and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

a. Certifying the proposed Class and State Subclasses as requested herein;

b. Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

c. Finding that Defendants engaged in the unlawful conduct as alleged herein;

d. Enjoining Defendants' conduct and requiring Defendants to implement proper data security policies and practices, including:

i. Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. Requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. Requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and the Class members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and the Class members;

iv. Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Plaintiffs' and the Class members' PII;

v. Requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vi.  Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii.  Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

viii.  Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.  Requiring Defendants to conduct regular database scanning and securing checks;

x.  Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and the Class members;

xi.  Requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal

security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. Requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting PII;

xiii. Requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor their information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. Requiring Defendants to meaningfully educate all Class members about the threats that they face because of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xv. Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers;

 xvi. Requiring Defendants to design, maintain, and test their computer systems to ensure that PII in their possession is adequately secured and protected;

 xvii. Requiring Defendants to disclose any future data breaches in a timely and accurate manner;

 xviii. Requiring Defendants to implement multi-factor authentication requirements; and

 xix. Requiring Defendants' employees to change their passwords on a timely and regular basis, consistent with best practices.

e. Awarding Plaintiffs and Class members damages, including actual, consequential, statutory, and nominal damages;

f. Awarding Plaintiffs and Class members pre-judgment and post-judgment interest on all amounts awarded;

g. Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

h. Granting such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs, individually, and on behalf of all others similarly situated, hereby demand a trial by jury as to all matters so triable.

Respectfully submitted,

Dated: November 15~~June 7~~, 2021

*/s/ Nikoletta S. Mendrinos*——
Nikoletta S. Mendrinos (Bar No. 18961)
Kaitlyn T. Holzer (Bar. No. 21684)
**MURPHY, FALCON & MURPHY, P.A.**
One South Street, 30th Floor Baltimore,
Maryland 21202
T: (410) 951-8744
F: (410) 539-6599
nikoletta.mendrinos@murphyfalcon.com
kaitlyn.holzer@murphyfalcon.com

*Liaison Counsel*

Gayle M. Blatt, *Pro Hac Vice*
P. Camille Guerra, *Pro Hac Vice*
Catherine M. McBain, *Pro Hac Vice*
**CASEY GERRY SCHENK
FRANCAVILLA BLATT &
PENFIELD, LLP**
110 Laurel Street San Diego, CA 92101
T: (619) 238-1811
F: (619) 544-9232
gmb@cglaw.com
camille@cglaw.com
kmcbain@cglaw.com

David M. Berger, *Pro Hac Vice*
Rosemary M. Rivas, *Pro Hac Vice*
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
T: (510) 350-9700
F: (510) 350-9701
dmb@classlawgroup.com
rmr@classlawgroup.com

Hassan A Zavareei, *Pro Hac Vice*
Dia Rasinariu
**TYCKO & ZAVAREEI LLP**

1828 L Street NW Suite 1000
Washington, DC 20036
T: (202) 973-0900
F: (202) 973-0950
hzavareei@tzlegal.com
drasinariu@tzlegal.com

John A. Yanchunis, *Pro Hac Vice*
**MORGAN & MORGAN**
201 N. Franklin Street, 7th
Floor Tampa, FL 33602
T: (813) 233-5505
jyanchunis@forthepeople.com

*Interim Class Counsel*

## LR 102.2(b) CERTIFICATION OF COMPLIANCE

Undersigned counsel certifies that the foregoing First Amended Consolidated Class Action Complaint complies with all formatting requirements of the Local Rules.

~~is application complies with all formatting requirements of the Local Rules.~~

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th~~7th~~ day of November~~June~~ 2021, a copy of the First Amended Consolidated Class Action Complaint was filed with the Clerk of the Court via the Court's CM/ECF system which will automatically send e-mail notification of such filing to the registered attorneys of record.

*/s/ Nikoletta S. Mendrinos*
Nikoletta S. Mendrinos