UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| IN RE US FERTILITY, LLC<br>DATA SECURITY LITIGATION<br><br>This Document Relates To:<br><br>*All Actions* | **Master File No. 8:21-cv-299**<br><br>**Plaintiffs' Response to<br>Memorandum Order** |

## PLAINTIFFS' RESPONSE TO MEMORANDUM ORDER

Plaintiffs appreciate the Court providing this opportunity to respond to questions regarding the proposed settlement. The court asked Plaintiffs' counsel to respond to two questions about the settlement:

(1) How the $5,750,000 Common Fund is enough to adequately compensate Class Members; and
(2) The priorities of distribution for the various categories of monetary benefits to be paid out of the Common Fund.

Memorandum Order, Dkt. # 107. After briefly summarizing the monetary benefits of the proposed settlement, Plaintiffs will address the Court's questions in reverse order.

### I.    The Settlement Provides Meaningful Monetary Benefits

The settlement provides four categories of monetary benefits.[1] Class Members can receive payments from each category that they are eligible for, subject to a total per person cap of $15,000. The 4 categories are:

  i. General cash payments to all class members who file claims with a presumed value of $50;

---

[1] The proposed settlement also requires US Fertility to implement meaningful business practice changes to protect Plaintiffs' and Class Members' PII and PHI. While these also are important benefits provided by the settlement, this analysis considers only monetary benefits.

    ii. CMIA Subclass members will receive a cash payment at a presumed value of $200;

    iii. Out of pocket benefits for documented financial losses capped at $15,000 per Class Member;

    iv. Attested lost time, payable at $25 per hour with a 4 hour cap.

## II. The Priorities for Distributing the Settlement Funds

Class Counsel have prioritized the settlement's monetary benefits in two ways: (a) by establishing different caps or presumptive payments, and (2) by proposing pro rata increases or decreases, depending on whether the settlement fund is over-subscribed or under-subscribed. Plaintiffs will address these in turn.

### A. Why Class Counsel Proposed these Caps and Presumptive Payments

Class Counsel established the value for each monetary benefit based on class member data and counsel's own experience in many previous data breach settlements.

First, Class Counsel anticipate that the bulk of the settlement fund will be distributed as a general payment to members of the nationwide class. Class Counsel estimate that this fund will permit distributions of roughly $50 to each Class Member who submits a claim. That said, the precise payment may vary substantially depending on the claims rate.

In Class Counsel's experience, the claims rate itself often is driven by the presumptive payment amount. If the Class Notice suggested that each class member could receive $1,000 per person, the claims rate would increase substantially. Conversely, suggesting that the payment would be just $25 would result in a substantially lower claims rate. Here, Class Counsel suggest that a presumptive payment of $50 will be sufficient to increase the claims rate without oversubscribing the settlement. Class Counsel are not aware of any rigorous studies that have meaningfully considered and isolated the effect of presumptive payment amounts on claims rates. On the other hand, Class Counsel's experience in settling dozens of data breach cases leads us to believe that a presumptive payment of $50 likely will be adequate to pay claims without pro rata reductions. Based on prior settlements, Class Counsel have projected a 4% to 5% claims rate for the $50 payment, which would result in class members receiving approximately $1,900,000.

Second, the settlement provides members of the CMIA subclass with up to $200. This benefit is relatively larger because the CMIA provides up to $1,000 per person in statutory damages. Given the substantial risks and delays that this claim would face in proceeding to trial, Class Counsel believe that the $200 benefit is a good result. While $200 per person is a relatively large amount of money, the CMIA subclass consists of only a 5,500 people. Accordingly, the CMIA payments are unlikely to appreciably diminish the settlement fund. Based on a projected claims rate of 10%, the CMIA class would recover approximately $110,000 of the Settlement Fund.

Third, the out-of-pocket loss benefit permits recoveries of up to $15,000 per claimant. Class members claiming out-of-pocket damages must submit claims supported by documentary evidence of their losses, so most claims will be substantially lower than the cap. Each claim will individually be evaluated by the Settlement Administrator, who will decide the precise amount to award.

The high per person cap reflects the fact that class members with out-of-pocket losses typically have substantially higher damages than other class members. Often, these individuals have suffered repeat incidents of identity theft as a result of the data breach. At the same time, only a small number of eligible class members typically file claims for out-of-pocket losses. In Class Counsel's experience, claims for out-of-pocket expenses never have exceeded two percent of the common fund. Here, Class Counsel have projected that the out-of-pocket costs claims will total approximately $66,000.

Finally, the settlement fund allows Class Members to recover up to $100 for spending time dealing with the fallout from the data breach. In order to claim this benefit, Class Members have to submit an attestation specifying the amount of time they have spent on these issues. Class Counsel propose this benefit based on their conversations with thousands of people affected by data breaches over the past decade. One of their most common complaints is that settlements often fail to compensate them for the disrupting effects of responding to data breaches. In Class Counsel's experience, the claims rate for lost time benefits varies widely from case to case. Here, Class Counsel have projected a 1% claims rate for lost time, which would result in these claimants receiving $884,090 of the common fund.

### B. How Benefits Will Be Adjusted

The proposed settlement also provides for pro rata adjustments depending on the claims rates. *See* Settlement Agreement ¶ 64, Dkt. # 106. All payments will be reduced pro rata if the claims rate is too high to pay all valid claims at either their presumptive values (for the general cash payment and CMIA payments) or the amount approved (for out-of-pocket damages and lost time). The pro rata reductions will be applied to all payments, regardless of the benefit type.

Conversely, if the claims submitted do not exhaust the Settlement Fund, then the general cash payments and CMIA payments will be increased pro rata. Increasing just these two benefits is sensible. In this situation, all out-of-pocket losses and lost time claims already would be paid in the maximum approved amounts, so there is no reason to increase those awards pro rata.

Finally, as we believe the Court noticed, the Settlement Agreement originally contained a paragraph that prioritized funding certain benefit categories over others. *See Id.* ¶ 63. That paragraph conflicted with the next paragraph, which provided for pro rata reductions to all settlement payments. *Id.* ¶ 64. This was a drafting error. On September 21, 2023, the Parties amended the proposed Settlement Agreement to delete the text of paragraph 63, without making any other changes to the document. September 2023 Amendment to Settlement Agreement, Dkt. # 111-1.

### III. The $5,750,000 Common Fund will Adequately Compensate the Class Members.

The Court first question concerns what would happen if 6.8% (or more) of class members file claims for the general cash payment. As the Court correctly observes, this would exhaust the common fund. As discussed above, Class Counsel think this is unlikely. In any event, if the value of the claims exceeds the funds available, all payments would be reduced pro rata.

The Settlement, nonetheless, will adequately compensate the class. In fact, the settlement value per class member exceeds that of other consumer data breach class action settlements. For example, Cornerstone Research released a report examining high-profile data-breach settlements between 2018 and 2021. *See* Exhibit A. For many of these settlements—including settlements involving Equifax, Anthem, and Yahoo!—the settlement value per class member was less

than $3.00.[2] For all but one of these settlements, the value per class member was less than $4.00, and for the final settlement (with only 34,000 class members), the value per class member was $5.74.

This data is consistent with data provided by Angeion, the settlement administrator proposed by Plaintiffs, as to data breach settlements that it has administered. *See* Exhibit B. Specifically, the dollar value per class member for every settlement administered by Angeion with 200,000 or more class members is less than $4. And excluding some settlements with fewer than 50,000 class members,[3] the highest dollar value per class member was $13.07.

Here, in contrast, the settlement value is $5,750,000, and the value per class member is $6.50. Thus, assessing the settlement value as a whole in comparison to other large data breaches, the settlement agreed to by the Parties is more than adequate.

The adequacy of the settlement is further underscored by the risks that Plaintiffs and class members face should the litigation proceed. Plaintiffs' counsel—who have been involved in several of the highest profile data breach cases, including most of those cited in the Cornerstone Research report mentioned above—are confident in their arguments for class certification in this case. Nonetheless, counsel has seen few data breach cases proceed to class certification and even fewer where class certification is granted. The risks of class certification are underscored by the recent Fourth Circuit opinion in *In re Marriott International, Inc., Customer Data Security Breach Litigation*, 78 F.4th 677 (2023). The *In re Marriott* opinion was based upon grounds not applicable here, and is thus not directly relevant to the likelihood of class certification, but it underscores the challenges in certifying a data breach class. Like in *Marriott*, there is a risk here that the Court may find that a class cannot be sustained.

Moreover, should the case proceed to trial, Plaintiffs face the risk that Defendants' narrative may be more compelling to a jury than most. Here, US Fertility likely will argue that it was formed shortly before the breach, unlike

---

[2] Calculated based on the gross settlement value, including payments for service payments, attorneys' fees, and other costs.
[3] Because of the small size of the class in these cases, they are not representative as to settlements for large data breaches as the per class member settlement amounts are disproportionately affected by the cost avoidance value of settlement.

some defendants that knowingly neglected data security for years before an incident. Since the breach, US Fertility has made significant improvements in its data security. As a result, the settlement's injunctive relief terms are narrowly focused instead of the wide-ranging security commitments common in many data breach settlements.

Dated: October 10, 2023	Respectfully submitted,

/s/ David M. Berger
David M. Berger (*pro hac vice*)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
dmb@classlawgroup.com

Hassan A. Zavareei (Bar No. 18489)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave NW, Suite 1010
Washington, DC 20006
(202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com

John A. Yanchunis (Bar No. 0324681)
**MORGAN & MORGAN**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 233-5505
jyanchunis@forthepeople.com

Gayle M. Blatt (Bar No. 122048)
**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
gmb@cglaw.com

*Interim Co-Lead Class Counsel*

>Nikoletta S. Mendrinos (Bar No. 18961)
>**MURPHY, FALCON & MURPHY**
>One South Street, 30th Floor
>Baltimore, Maryland 21202
>Telephone: (410) 951-8744
>Facsimile: (410) 539-6599
>nikoletta.mendrinos@murphyfalcon.com
>
>*Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 11, 2023, a copy of the foregoing was filed with the Clerk of the Court via the Court's CM/ECF system which will automatically send e-mail notification of such filing to the registered attorneys of record.

>*/s/ David M. Berger*
>David M. Berger (admitted pro hac vice)